We have two cases on our calendar this morning. Both patent cases, one from the district court, one from the PCAB. And the first one is Konami Gaming Inc. v. High 5 Games, 2018-17-23. Mr. Hullaburger. Hullaburger, sorry. Hullaburger. Hullaburger. Good morning, your honors. May it please the court. Chris Hullaburger of Howard & Hounter Attorneys on behalf of the appellant, Konami Gaming Inc. We're here this morning. The district court's opinion must be reversed for at least three reasons. First, as to the claim construction, the court failed to apply the proper claim and unmistakable – the clear and unmistakable disclaimer standard in construing notional, non-visible inner reel, and then went on to apply that improper construction to claims that did not – Why at page three do you say the court granted summary judgment on September 30th, 2017, and nearly five months later issued the written order on February 22nd? What's the relevance of that five months? So this particular claim construction hearing lasted about four days, three days, and then it was very lengthy, and there was a lot of discussion of trying to explain the technology, and that additional time is significant to the understanding, perhaps, of where the opinion was drafted or how it came out. How? I think it was just a misunderstanding, largely, of how the technology operated over and over and over again. Well, it does operate over and over and over again, yes. Certainly, your honor, in the invention it does, yes. Counsel, the trial court found these claims to be means plus function because they, in effect, recited means with function and no structure, and so how do you get around the indefiniteness when a MPF claim recites no structure at all? Then claims are indefinite. So these claims don't recite the word means as their initial stepping off point. There was a presumption against, but the court found the presumption rebutted. Correct, and as part of that analysis, the court has to, when the term means is not present, they have to address this rebuttable presumption that it was not intended to be means, and as a part of that test, the court has to consider how these terms are used in the industry and whether or not they have a meaning for structure. Where did the court conclude that random number generation was not well known in the record? I would say, I would direct your honor to... You cite me to JA 9 and 10. I don't see that. Throughout his opinion, your honor, the judge identifies it, this notional non-visible inter-reel as a unique process or a new process, and he does it on pages 7 and 8, 9, 24, 25, and at least on page 9, the significance there was he was... Correct. Where does he say random number generation is not well known? I take that as the opposite, that there is such a standard thing. I'm sorry, your honor. Could you say that again, please? Okay. You say on page 27 of the blue brief, the court erred by concluding random number generation was not well known and that the process for translating generated random numbers into random selections was not both well known and standard. Where did he say... Because you cite me to 9 and 10, and I look at that, and I see the opposite. Well, and I think that's our point, is we believe that it is well known, and as part of the analysis in this... No, no. Where did he say, Judge Bowyer? Correct. Where did he say that it was not well known? In his claim construction for this particular term. Okay. He says that... Show me. Sure. Well, okay. There's an extensive record here, so give us a moment to page to it. I'm sorry, your honor? We have six volumes, so give us a minute when you tell us what page. It had to do with the claim construction analysis for notional non-visible inter-reel, and I would say, your honor, it's on pages six, seven, and eight, where in construing notional non-visible inter-reel, Judge Bowyer looks at the prosecution history, and in it, when the examiner says, notional non-visible inter-reel, I understand that to be a random number generator in a lookup table, he concludes that, and this is page eight, lines 10 through 12, the court says, this is to say that notional non-visible inter-reel cannot simply represent the use of a random number generator with a lookup table to randomly select symbols. And that's exactly what... How on earth does that tell me that a random number generator is not well known? Well, I think that sentence says that it can't be just a random number generator, because it has to be something more. It can't simply represent the use of this random number generator lookup table, and he wants something more. I guess we're talking past each other, but unfortunately for you, when you talk past me, it doesn't help you. Understood. Well, Your Honor, I'd point you to also page nine, appendix page nine, lines 10 through 12, where it says, a game developer would need to know the specific requirements of the game to determine which random number generators would properly serve the needs of the game. Okay. And... How does that say random number generation is not well known? Again, it seems to say the opposite to me. The court is saying random number generation is well known, but you need to do this. The use of the random number generator and how it generates a number for use in the games is well known. It absolutely is. And the court says that, right? Well, he doesn't, because when it gets to the algorithm step of the means plus functions test, he says, you have to tell me the specific process that you use for random number generation. And he required an algorithm or a specific algorithm to be recited. And the experts testified that random number generation... Cite me to that line, please. Sure. Because I think he said a lot more than that. I mean, I can say to you, high fives expert, which is APPX2697. Wait, wait, wait, wait, wait. You just told me the judge said something. That's what I asked you for. I'm sorry. I thought you... Why don't you look it up and bring it to us on rebuttal? Okay. You want to get to your 101 argument? Sure. Thank you. So on the 101 analysis, the court erred in holding that the claims were game rules and then erred in relying on the improper claim construction of notional non-visible inner real to find the inventive concept. If it's not game rules, what in your view is a proper description of what the claim is? So this claim very specifically recites the structure of the game real and it defines the different sections. So it's got sections of fixed symbols and a section of what they call a consecutive run of identical symbols. And it picks or selects this identical symbol and inserts it into that consecutive run. Each game the game is played. What's the set of rules? I'm sorry, sir? Set of rules for how it functions. Well, I mean, the rule for how it functions is it's going to spin like a standard old video electronic slot machine. That's nothing new. The new aspect of this was the structure of the real and the fact that you have these defined sections where every game you get a new real. You get a new set of symbols. And what that led to was trying to attract or keep the player attention during the game because the symbols are changing. So the first game you might have a consecutive real of aces and then that would generate a lot of excitement. And then the next game you have nines and then kings and then wilds. And so that structure changes. Correct me if I'm wrong, but, again, I think we're talking two different things. Aren't the game rules what the Nevada Gaming Commission or the Gaming Board approves in, I think it was Smith, that you're talking about, well, you put an ace down and then you put a king down and so on. And these are the rules of the game. So the rule of the slot machine game would be if you promise to pay out 98.7 percent, you have to set the machine at 98.7 percent. Correct. This is something different than game rules. Absolutely. Game methodology, in this instance, is a way of convincing the player that, gee, they came really close and they ought to put another quarter in. Well, I mean, that is that philosophical. Judge Wallach is the kind of basis of all casino games making the player think they're going to win, but at least as a result. No, no. What I said was that it interests them in the game and so on. I'm not saying they're being cheated. No, no, and I appreciate that. I think that is a aspect of it, but I think the ability to maintain that 98.6 payout while simultaneously giving various different symbols that are selected each game, that is a game math improvement and the improvement to the game. But it's not a game rule. Correct. I don't believe that it is. And I think In re Smith is distinguishable because that was all about, you know, this course said that that was an economic fundamental principle of determining wagers and, you know, resolving the bets. That's not what these claims are directed towards. If you had to, I tend to agree with you. I think you showed how it functioned. You might have something, but I don't see that. Okay. Your Honor, I've exceeded my ten minute opening. Is there any other questions? You could continue, but we'll save the time for rebuttal if you like. Thank you. Mr. Ryan, you are splitting your time. I have nine minutes, but I suspect I'm not going to be using it all and ceding it to my partner, Tag Donaghy, for the balance. I'm up here for nine minutes initially. All right. My name is Bob Ryan. I'm with Holland and Hart, and I represent High Five. My partner, Tag Donaghy, is with me and will argue the 101 issues. I'm here to argue 112. You mean we can't ask you a 101 issue? Well, you may, but I would prefer that I defer to him. So, if you'd like to get into 101 to start. By splitting up, representing the same client, you are inhibiting the court from asking the questions. Well, you're welcome to ask me anything you'd like, Your Honor. But there was so much raised in the 112 arguments presented by Konami in what we would call a scattered-on approach to briefing before the court that we felt the need to divide it up. Excuse me? It exceeds the capacity of one lawyer. It was challenging for me to prepare for 112. Well, let's argue the way you want. Thank you, Your Honor. I appreciate it very much. I don't believe I have a lot to say about it based on what I've just heard. But let me say this, if I may. First of all, I want this court to understand this is not about invalidating a large swath of patents in the gaming industry. Would you agree this is not about rules? It's partially about rules. What's the rule? One of them is that there's a consecutive string of identical symbols that are replaced during playing of the game. That's in all claims. Does the Gaming Commission approve or require that as part of a slot machine licensing? No. No. What would happen is… How would it be the rules of the game? Well, that's one of the rules of the game, is that there's this substitution that takes place in that consecutive string during the playing of the game, which is, of course, an ultimate outcome of the game. As I understand it, the player pushes the button on these electronic ones, and instantly the machine knows, decides, based on an algorithm, whether they won or lost. That's correct. Right away. It's simply showing them some entertainment before they know if they've won or lost and how much. That's correct, Your Honor. And it strikes me that that's the rule. The Gaming Commission would say, as I said to your opponent, if you say 98.7, you have to pay out 98.7. And in the old days, when slots were mechanical, the rules were that the machines had to be honest, that they had to be well-maintained, and so on. Yes, Your Honor. But it's not… I'm trying to draw a distinction between this and Smith, for example, where the rules of that thing were not patentable. We believe the rules of this are not patentable as well, including because… So no slots can be licensed? No, no. Slots can be licensed and can be patentable generally, we believe. But not in a case like this, where you have nothing really that's any different than what preexisted. How is that a rule? Pardon me? I tend to agree with you. Okay. But how is that a rule, as opposed to means plus function? Well, it's both. It's an ultimate outcome in that to the extent that the rule, which Mr. Yoshimi invented, supposedly, is the ultimate outcome of the game, what the player sees as an aristocrat, the line gaming case before the court, which the court decided, which I think has a far more extensive disclosure about how to do things than this case, where it's just a wish list of what would appear at the ultimate interface to the user. Those are the rules. The rules being, what is it going to look like to the user when they play this game? Being the ultimate outcome of the game, which is what's claimed. And you can't do that unless you teach an algorithm, according to aristocrat and many other cases like NOAA. And it follows directly from Williamson, in our view. Did I answer Your Honor's question? Well, not from my viewpoint. Okay. And that is, I would view that, in effect, as advertising. And if you come up with a new invention that advertises the game or entertains the player in a different manner, and you have patentable content, I think you can patent it. I think their problem is that they didn't tell you what they were doing. That's right. It doesn't tell you. They didn't. That's the point. We agree with Your Honor completely on that point. What they did is they have a very, very high-level concept that's not implemented in the teaching. There's no samples for how to do any of this. It's an idea. This is a wish list patent. Wouldn't it be nice if I could fly to the moon, drop a lunar excursion module, and bring it back to the earth? Are you talking 101 now or 112? It's both. I believe it's both, Your Honor. The same deficiencies lead to the same issue of inclusion on both sides. Why isn't the game controller structure? Pardon me? Why isn't the game controller structure or the various reels, aren't those parts? They're parts, but they don't inherently perform what the game does. A processor does not inherently perform this game. If it did, it would be prior art and it would be anticipated. If you define a machine, an automobile, it performs functions. The mere fact that structure performs some functions doesn't mean that it automatically, if you have it in a claim, that it's a means plus function. That's right. Your adversary's argument is everybody in this industry understands what these structural pieces of a slot machine are, a controller, this, that, and these reels. Those are all structural. There's not a conventional way to generate a reel. Every company does it differently. No matter how you're generating, the thing, the reel, it's structural. Now, in this case, it's not. It's all being done electronically, right? It's automated. It's virtual. So it's a virtual piece of hardware. Right. A thing. Right. So why isn't that thing structured? It is structured. There's an algorithm that's required to generate it, but it's not in the patent. Right? You have to have an algorithm to generate that reel. You're telling me that every claim that claims structure, where the structure performs a function, automatically becomes a mean plus function claim? In this case, yes. Are you telling me every one? Every claim. No, no, no. I know in this case I'm making a hypothetical. Okay. Forgive me. So you take a structure. Yes. Like a machine. Right. Machine performs functions. Right. The fact that the machine performs function doesn't convert the machine structure claim into a mean plus function claim, right? If I recite structure in the claim sufficient to perform the function. But if I claim a function of the machine, and that function is not routinely done by a well-known structure in the industry or a set of them, then it's a functional specification, and you are tied to then the description in the spec. The structure in the spec. Yes. If there's structure in the spec. I'm just talking about how you go about deciding whether a claim is a mean plus function claim in the first place. When there is no means plus sighted, there is a presumption that the structure you're claiming is sufficient structure. When you read the way our law reads, if you haven't used the magic words, means plus or step plus, right? It's presumptively a structural patent. Presumptively. Presumptively. That's correct. So how do we know that the structure we cited in this, the pieces of the slot machine aren't sufficient structure? Because what's claimed is the ultimate outcome. An ultimate outcome, this court has repeatedly stated. It's a piece of structure that achieves the outcome. They don't recite that. Automobile capable of carrying people. If you recited an automobile capable of carrying people, that would not be structure, right? It wouldn't be sufficient to identify everything that's in that automobile. But we're not talking about an automobile here. We're talking about a computer, a general purpose computer. And this court's law is well established that once we're to a general purpose computer, and this was an aristocrat. It started there dominantly. Once you're to a general purpose computer, if you're claiming the ultimate outcome of what happens at the interface to the user, that's function, which it is. Because there's no teaching for how to get there. How to do it is not taught. Under this court's law, the how are the acts. The how is the structure. It's not there. Well, acts relate to method claims. That's correct. This isn't a method claim. There are some method claims, Your Honor. There are method claims here. There are some. In the industry, is it unknown to have an algorithm that generates all three wheels at once? All three wheels? Could one of skill and the art do that? Yes. How they would do it would be in innumerably different ways. I understand that. Yes. So my point is that it's not like a mechanical device. It isn't. The reels can just be the result of one generation. That's right. And, in effect, they may well be. They could be, but there's nothing. Then you'd have subroutines and subprograms. Right. But there's nothing in the specification about how to get it. Exactly. I understand that. But I'm drawing towards the question you were asked about the different reels being generated differently. And that's not necessarily true because you said it was. No, it is. They could all. They could be or they could not be. The manufacturers, all the manufacturers do their own programming. Nobody copies anybody else. They can't. That's highly proprietary. Ryan, you wanted to split your time? Yes, I do. Mr. Donahue has six minutes. May it please the court. Ted Donahue. I'm here to address the one on one issues. I want to directly address your game rules questions. I think it's important to recognize that there are two alternative ways to affirm the court on Alice step one. Number one is the game rule issues that you were addressing. But number two, there's a line of cases, Apple v. Amaranth, etc., that hold that when the claim is directed to functionality, functional claiming without a specific set of concrete implementation of that functionality, that also invokes the abstract idea Alice step one problem. So whether you conceptualize it as a game rule issue or a functional claiming issue, either way, we still have claims that are directed to an abstract idea. Most of these claims, many of them are to a gaming machine. Section 101 expressly provides for eligibility for machines. Well, that's in the preamble, Your Honor. And the patentee has taken the position that gaming machine is not a limitation on the invention at all. And and so I don't think that's an issue here. Moreover, I will note that under Alice, conventional generic computing components are not enough to elevate an abstract idea to a patentable invention. And that's really what we have here. But according to the dialogue that was going on earlier, Judge Wallach and your other colleague, there was a question about whether or not this was an abstract idea in the first place. If it's not an abstract idea, then if you're 101 goes away. Right. If it's not an abstract idea. So what if if it's a means plus function claim that doesn't have enough structure in the spec? That doesn't mean it falls under 101. Your Honor is correct that if if if this were understood as being something more than a mere abstract idea under the law, it would be patentable. What's your response to the I won't put words in Judge Wallach's mouth, but I heard him to say, well, this is not a game rule. Well, I don't believe that Smith ties the concept of game rules to the regulations. There's nothing in Smith that suggests that. And I will note that Smith was recently reaffirmed in the golden our case, which came down in December after the briefing was complete. That's nine eleven. Third, one, one, five, seven. And that was a dice game and nothing in that case didn't matter. Printed matter. Correct. Nothing in that case suggested that the game rule concept was tied to regulations. Everything in those cases indicates that when you're talking about patents that are directed to rules for a game, we're talking about the rules for how the game is played, what the game is at an abstract conceptual level. And I think the import of those holdings is that if all you're claiming is how to play a game at a very high level in an abstract sense, that's an abstract idea. And if you want a patent on that, you have to take it to the next step. You have to talk about a particular technological implementation of that game here. We don't have that. These patents are really hollow shells that are directed to the game features and the game functionality without any concrete way of implementing the game. And that's the problem. But both from 112 and 101, it's similar, similar set of issues. The other thing. Oh, there's a amicus brief in this case, isn't there? Yeah. So the amicus brief says don't throw the baby out with the bat. Yeah. Right. Well, we're certainly, to reiterate, we're certainly not arguing that all gaming patents are invalid. That's not the point here at all. So why aren't they? Well, how do you save the baby? What's the opinion look like that you agree with that invalidates these claims on 101, but leaves room for some other slot machine makers to salvage their claims? I'm sorry. Yes. You have to look at each patent on its own, and you have to look at what's being claimed and what's disclosed. Gaming patents are no different. Take another patent in the same field where we would conclude it's game rules, assuming that the patentee can invent the rules instead of the gaming commission. So we have an abstract idea how much, what has to go into the patent to save it under step two, to save a slot machine patent. Details about how the game is going to be implemented. That needs to be the invention that's being claimed for patent, patentability. Would you say that if you wrote one of these claims in mean plus function format on purpose, and then disclose specific algorithms? That would be an excellent example. So you satisfied, I mean, really very specific algorithms were tied exactly to the function, so that it was just a neat little package on 112. That would satisfy the second step of that? That definitely could. Gaming patents in this sense are no different than patents in other fields. You need to have meat on the bones, and that's what's absent here, and that's what's creating the problem. It's not necessarily a gaming patent issue. Now, perhaps IGT has patents that were issued pre-ALICE, and maybe it's concerned about them. That's a different question. Thank you. And I see I'm out of time. Thank you, counsel. Thank you. Mr. Hullerberger has some rebuttal time. Thank you, Your Honors. To quickly address the random number generator of Judge Wallach. Yes, where's your page say? So again, I would point to pages 9 and 10 in the brief, and how you get there, the reason that. In the appendix, you mean? Appendix 9 and 10, correct. And it starts at line 20 on page 9, appendix 9 through line 7 on page 10. And the reason this was cited for random number generator is not well known, is what this court did is it interpreted notional non-visible inner real. And random number generator doesn't appear in the claim, so notional non-visible inner real, he said, needed this unique process of a random number generator lookup table. And in 9 and on the 10, he says that random number generator requires a process, and then you have to do something with the output of that process, and it's not a standard part of these game developer kits, which at that time it was. And that's an incorrect conclusion. And it goes on to say that this process is not a standard algorithm or set of programming associated with a generic processor or game controller. And our citation to this is because that is, random number generators were standard. They had standard algorithms at that time, and they were widely known and used. And this passage demonstrates the confusion as to what was necessary in the claim. Wait, wait, wait, wait, wait, wait, wait, wait, wait. What the court says is, as plaintiff's own expert testified, there must be after the generation of a large number from the random number generator, and then he puts in quotes, a process to turn this large number into a random selection that would compress that number into a random selection within the range of positions on each real. Close quote. That's your expert testifying, is it not? Yes, sir. Okay, he said that's not a standard part of a random number generator's programming. Is that correct? He does say that, yes. No, is that correct? That it's not a standard? I mean, random number generators are used in decoding and intelligence, all kinds of things. Yes. That's not a standard part, is it? The standard part is turning it into a selection in the slot machine. That is correct. That would not be a standard random number generator, and that's why this court got it wrong. Because it was requiring so much more on a term of notional non-visible inner real, or the term randomly select in the later patents. Random number generator doesn't appear anywhere. And, you know, to address some of this means plus function analysis that goes along with it, one of the problems in this opinion is they talk about Williamson, and the court cites to a passage of Williamson as the standard, and actually drops out the word term. So the court said, and this is on appendix page 12, line 6 to 8, in talking about the presumption, and the court says all that he's got to find is that the claim fails to recite sufficient structure, as opposed to a claim term that fails to recite sufficient structure. High Five advocated to this court that, and as we heard earlier, if you have a function in a claim, it's means plus function. And in this particular case, Konami sets forth processor, a well-known structure, game controller, a well-known structure in this industry. There were 800,000 devices on the floor, and for all of those reasons, these elements are being used for their well-known purpose. A processor to execute a game, a display device to display. This isn't all of the other cases where you have Williamson's, which is doing some function that's not the standard or co-extensive with the device itself. Thank you, Your Honors. Thank you, Counsel. We'll take a break.